IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

N5 TECHNOLOGIES LLC,            )
    Plaintiff,             )
                  )
    v.                     )            Case No. 1:13-cv-386
                  )
CAPITAL ONE N.A., et al.,       )
    Defendants.            )
                  )

## MEMORANDUM OPINION

In this patent infringement case, N5 Technologies LLC ("N5"), the owner of U.S. Patent No. 7,197,297 ("the '297 patent"), sues defendants Capital One Bank (USA) N.A., Capital One Services LLC, and Capital One N.A. for direct infringement and for inducing infringement of the '297 patent, which purports to cover a specific method of authenticating mobile station users to access private data via sending text messages to a private server. As is typical in a patent infringement suit, the parties dispute the meaning of several material claim terms and phrases, thereby requiring *Markman*[1] claim construction.

Following full briefing and oral argument on the claim term disputes, an Order issued on August 16, 2013 setting forth, for reasons stated from the bench, the claim construction determinations. *N5 Techs. v. Capital One*, 1:13-cv-386 (E.D. Va., Aug. 16, 2013) (Order); *N5 Techs. v. Capital One*, 1:13-cv-386 (E.D. Va., Aug. 16, 2013) (Tr.). Thereafter, on September 27, 2013, plaintiff's motion for reconsideration of the claim construction determination was

---

[1] *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996).

denied. *N5 Techs. v. Capital One*, 1:13-cv-386 (E.D. Va., Sept. 27, 2013) (Order). This memorandum opinion records the reasoning in support of the claim construction determinations.

I.

Plaintiff N5, a Virginia limited liability company with its principal place of business in Manassas, Virginia, is the sole owner of the '297 patent, issued in 2007, titled "Authentication Method for Enabling a User of a Mobile Station to Access to Private Data or Services." N5, in the current vernacular, is a non-practicing entity claiming, without opposition, to own all right, title, and interest in the '297 patent.[2]

Defendants Capital One, N.A. and Capital One Bank (USA), N.A. are federally-chartered banking institutions with their principal places of business in McLean, Virginia. Defendant Capital One Services, LLC is a Delaware corporation with its principal place of business in McLean, Virginia. Capital One, N.A., Capital One Bank (USA), N.A., and Capital One Services, LLC are sued collectively for infringement and are referred to collectively herein as "defendants."

The '297 patent, which consists of 18 claims, recites a method for authenticating the user of a mobile station, *i.e.* a cell phone, to allow that user to access private information stored on a private server by sending a text message request from the user's mobile station. Plaintiff alleges that defendants' mobile banking service infringes on the claimed method of the '297 patent. Defendants' mobile banking service allows customers to access account information, such as their balance or the last transaction posted to their account, by sending a text message from an authenticated mobile station. On October 25, 2012, plaintiff filed a complaint in the United

---

[2] Accordingly, no standing issue is presented. *But see Suffolk Techs. LLC v. AOL Inc.*, 910 F. Supp. 2d 850 (E.D. Va. 2012) (adjudicating whether assignee of patent possessed "all substantial rights" to patent and therefore had standing to sue putative patent infringers).

States District Court for the Eastern District of Texas, alleging that defendants' mobile banking

services infringe independent Claim 1, and dependent claims 2, 3, 4, 6, 8, 9, and 10 of the '297

patent. On March 25, 2013, the case was transferred to this district.

The sole independent claim and the claim in which all disputed claim terms appear is

Claim 1, which "provides a method for accessing private data or services over a public *network*

including the step of authenticating a user of a mobile station [] for accessing to private

data/services." '297 Patent, Col. 1, ll. 45-48. Claim 1 reads as follows:

> 1. Method for accessing private data or services from a mobile station over a
> public network including the step of authenticating a user of the mobile station for
> accessing to private data/services, comprising the steps of:
>> composing a text-based request message on the mobile station using a
>> standard public messaging protocol, said message including a request for
>> private data, and sending said request message to a private server (MG,
>> PS) offering the access to said private data/services, via telephone
>> network,
>> **checking the authenticity of the user** of the mobile station based on the
>> request message received by the server,
>> if the authenticity of the user of the mobile station is confirmed, composing a
>> text-based response message using a standard public text messaging
>> protocol, the response message including the requested private
>> data/services of the private server, and sending back to the mobile station
>> said text-based response message, via the telephone network,
> wherein the request message additionally includes a **user unique identifier**, and
> is received by the private server with an appended user mobile station number,
> wherein the authenticity checking performed by the private server comprises the
> steps of:
>> **checking whether the user unique identifier is stored in a private**
>> **directory database, and**
>> **checking whether the appended user mobile station number matches with**
>> **the user mobile station number allocated to the user unique identifier**
>> **stored in the private directory database;**
> and wherein, if the user authenticity is confirmed, an interaction between the
> private server and the mobile station is limited to the exchange of the text-based
> request message and the text-based response; and repeating the recited steps for
> any further interaction between the private server and the mobile station.

The parties dispute the meaning of two claim terms and the order in which certain steps

are to be performed. The disputed portions of Claim 1, in bold above, are:

(i) "user unique identifier;"

(ii) "checking the authenticity of the user;" and

(iii) the order for executing the steps of "checking whether the user unique identifier is stored in a private directory database" and "checking whether the appended user mobile station number matches with the user mobile station number allocated to the user unique identifier stored in the private directory database."

## II.

Over the nearly two decades since *Markman*, the elucidation of claim construction principles has become well-plowed ground, although the plowed furrows have not always been straight lines. Nonetheless, the claim construction principles pertinent here are now well-settled. They are as follows:

First, and importantly, "the claim construction analysis must begin and remain centered on the claim language itself" because a "bedrock principle" of patent law is that "the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115–16 (Fed. Cir. 2004). Accordingly, a court must "look to the words themselves . . . to define the scope of the patented invention." *Vitronics Corp. v. Conceptronic*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). And the "words of a claim are generally given their ordinary and customary meaning." *Phillips v. AWH Corp.*, 415 F.3d 1301, 1312 (Fed. Cir. 2005) (internal quotation marks omitted). The "ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of invention, *i.e.*, as of the effective filing date of the patent application." *Id.* at 1313. A person of ordinary skill in the art "is deemed to read the words used in the patent documents with an understanding of their meaning in the field, and to have knowledge of any special meaning and usage in the field." *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998). In the event that a claim phrase or claim

- 4 -

term's ordinary meaning is not apparent, then a court may—as would a person of ordinary skill in the art—look to "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Innova/Pure Water*, 381 F.3d at 1116. In this regard, it is important to note that courts engaging in claim construction must follow a hierarchy of evidence: (i) claim language, (ii) other intrinsic evidence—*i.e.*, the specification, the remainder of the patent, and the prosecution history, and (iii) extrinsic evidence—*i.e.*, evidence that is external to the patent and prosecution history, such as expert testimony or treatises. *See Advanced Cardiovascular Sys. v. Medtronic*, 265 F.3d 1294, 1304 (Fed. Cir. 2001).

Importantly, the claim construction effort should focus first on the intrinsic evidence, and only if that evidence does not yield the answer should a court proceed to extrinsic evidence. *Vitronics*, 90 F.3d at 1583. Of course, courts may always use extrinsic evidence to aid their understanding of the patent technology. *See Markman*, 52 F.3d 967, 980 (Fed. Cir. 1995) *aff'd*, 517 U.S. 370 (1996) ("The court may, in its discretion, receive extrinsic evidence in order to aid the court in coming to a correct conclusion as to the true meaning of the language employed in the patent.") (internal quotation marks omitted). With respect to intrinsic evidence, the Federal Circuit has recognized that the specification is "the single best guide to the meaning of a disputed term" and is often "dispositive." *Phillips*, 415 F.3d at 1315. Yet, courts must be cautious in using the specification to avoid limiting the scope of the claims by importing limitations of such embodiments into the scope of the claims. In this respect, there is "a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification." *Id.* at 1323. Indeed, to read "a limitation from the written description into the claims" is a

"cardinal sin" of patent claim construction. *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340–41 (Fed. Cir. 2001).

It is true, of course, that "a patentee is free to be his own lexicographer" and to give claim terms his own specific meaning. *Markman* 52 F.3d at 980. When a patentee acts as his own lexicographer, he may "use terms in a manner other than their ordinary meaning[.]" *Vitronics*, 90 F.3d at 1582. Importantly, a patentee acting as his own lexicographer must "define the specific terms used to describe his or her invention . . . with reasonable clarity, deliberateness, and precision." *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). Thus, any statement in the specification relied on to support the contention that the patentee acted as his own lexicographer "must have sufficient clarity to put one reasonably skilled in the art on notice that the inventor intended to redefine the claim term." *Merck & Co., Inc. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1370 (Fed. Cir. 2005). Although a patentee may "define claim terms by implication," the implied redefinition must also "be so clear that it equates to an explicit one." *Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1368 (Fed. Cir. 2012).

Thus, the claim construction analysis here begins with the application of these principles to the disputed claim terms. But importantly, as the Federal Circuit has noted, these "axioms themselves seldom provide an answer, but instead merely frame the question to be resolved." *Liebel–Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 904 (Fed. Cir. 2004). Indeed, the Federal Circuit's guidance on claim construction does "not attempt to provide a rigid algorithm, but simply attempt[s] to explain why, in general, certain types of evidence are more valuable than others." *Phillips*, 415 F. 3d at 1324. It remains now to apply these principles to the three portions of Claim 1 in dispute here.

## III.

### A. "user unique identifier"

The first disputed claim term is the phrase "user unique identifier." Col. 6, ll. 55-56. The parties' proposed constructions are:

- Plaintiff: "data that identify a user uniquely, including a user alias or any other uniquely identifying field allocated to a particular user in a directory/database."

- Defendants: "a combination of characters that uniquely identifies an individual mobile station user."

The parties' competing constructions make clear that three aspects of this phrase are at issue: (i) whether it is "data" or "a combination of characters" that must be used to identify a user; (ii) whether a "user" must necessarily be an "individual mobile station user;" and (iii) whether the phrase "including a user alias or any other uniquely identifying field allocated to a particular user in a directory/database" should be included in the definition of "user unique identifier."

### 1. "data" vs. "a combination of characters"

Plaintiff argues that the term should be defined as "data" that identify a user uniquely, while defendants argue that the term should be defined as "a combination of characters" that identifies a user uniquely. In their briefs, defendants assert that "a combination of characters" is the proper definition because the user unique identifier constitutes part of the text-based request message, which consists solely of characters. Yet, the specification explicitly defines the user unique identifier as "data": "the user unique identifier is a data [sic] that identify the user uniquely." Col. 6, ll. 13-14. Moreover, at oral argument, it became evident that there is no genuine dispute regarding use of "data" vs. "a combination of characters." When asked if defendants have any problem with replacing "a combination of characters" with "data," counsel

for defendants responded, "[n]one whatsoever." *N5 Techs. v. Capital One*, 1:13-cv-386 (E.D. Va., Aug. 16, 2013) (Tr.) at 18. Likewise, when asked to explain the difference between the two terms, plaintiff's counsel asserted that theoretically "a combination of characters is a subset of data," but that for the purposes of this case "there is not a distinction that matters." *Id.* at 13-14. Therefore, because the specification uses "data" to define the user unique identifier, and because both parties agree to its use, "data" is the appropriate construction.

### 2. Must a "user" be an "individual mobile station user"?

The next component that requires definition is whether "user" specifically references an "individual mobile station user" as defendants propose. Plaintiff argues that "user" should not be accompanied by any modifiers. Once again, the specification provides a clear resolution to the dispute. The specification states that "the authentication part comprises a unique identifier of the mobile station number." Col. 3, ll. 26-28. The specification provides further support as it explains that the authentication portion of the request message contains "a unique mobile station user identifier for the authentication of the mobile station user." Col. 5, ll. 30-32. Thus, the specification makes clear that a "user" is a "mobile station user."

Significantly, there is no support in the patent for defendants' contention that the user unique identifier necessarily pertains to an *individual* mobile station user, as opposed to a group of individuals or an entity. When questioned on this point during oral argument, defendants admitted that the patent "doesn't say the word 'individual'" and that no intrinsic evidence directly supports importing the word "individual" into the definition of "user unique identifier." *N5 Techs. v. Capital One*, 1:13-cv-386 (E.D. Va., Aug. 16, 2013) (Tr.) at 29. Accordingly, "user" in the context of "user unique identifier" is properly construed simply as "mobile station user."

### 3. "including a user alias or any other uniquely identifying field allocated to a particular user in a directory/database"

The final portion of the disputed phrase that must be considered is plaintiff's addition of "including a user alias or any other uniquely identifying field allocated to a particular user in a directory/database." Plaintiff proposes this addition based on language in the specification, which reads: "The user unique identifier can be the user alias, or any other uniquely identifying field allocated to this particular user in the ldap directory." Col. 6, ll. 13-16.

Yet, importing this language from the specification into the claim, as plaintiff suggests, poses two problems. First, the language in the specification provides two examples of what could constitute a "user unique identifier," but the specification itself does not define the term. Thus, reading this specification language into the claim would impermissibly constitute "reading a limitation from the written description into the claims," which is "one of the cardinal sins of patent law." *SciMed Life*, 242 F.3d at 1340. And second, any argument that the patentee is acting as his own lexicographer is unavailing. To act as his own lexicographer, the patentee must state clearly in the specification that a definition is provided for a claim term that is outside the term's ordinary meaning. *Vitronics*, 90 F.3d at 1582. The specification of the '297 patent fails to do so. Furthermore, even if the patentee were acting as his own lexicographer, plaintiff would not be free to modify the patentee's definition as plaintiff has done here. Plaintiff does not propose to import the relevant language verbatim from the specification, but rather broadens the language to reference "a particular user in a directory/database" rather than the narrower specification language "this particular user in the ldap directory." Accordingly, plaintiff's proposed language "including a user alias or any other uniquely identifying field allocated to a particular user in a directory/database" is not properly a part of the construction of the term "user unique identifier."

In sum, "user unique identifier" is defined as "data that uniquely identifies a mobile station user."

## B.  "checking the authenticity of the user"

The parties next dispute the meaning of the term "checking the authenticity of the user." Col. 6, l. 46.  The parties' proposed constructions are:

- Defendants: "determining that the unique user is authorized to access the requested data or services."

- Plaintiff proposes importing the authenticity checking steps recited later in Claim 1 into the definition, so it would read: "steps comprising: checking whether a user unique identifier is stored in a private directory database and checking whether an appended user mobile station number matches with a user mobile station number allocated to the user unique identifier stored in the private directory database."

Plaintiff's proposed construction, which repeats, nearly verbatim, steps that appear just a few lines later in Claim 1, would result in a redundant construction wherein the same language is first used to define the term and then again in the steps required to performed the defined term.[3]

---

[3] Claim 1, Column 6, lines 59-65 (emphasis added):

> wherein the authenticity checking performed by the private server comprises the steps of:
>
> > checking whether **the** user unique identifier is stored in a private directory database, and
> >
> > checking whether **the** appended user mobile station number matches with **the** user mobile station number allocated to the user unique identifier stored in the private directory database;

Plaintiff's proposed construction for "checking the authenticity of the user" (emphasis added):

> steps comprising:
>
> > checking whether **a** user unique identifier is stored in a private directory database and

Because the term language "checking the authenticity of the user" is adequately clear (as are the steps required to check the authenticity of the user), the term does not require any further definition.

The Federal Circuit has established that a district court may decline to construe a term beyond its plain and ordinary meaning when doing so does not leave unresolved questions of meaning and/or scope. *See Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010). *Finjan* held that although a district court must construe a term when there is more than one ordinary meaning or where there is an unresolved dispute as to scope,[4] "the district court was not obligated to provide additional guidance to the jury" because in giving the term its plain and ordinary meaning, it rejected the parties' alternative constructions and removed all issues of legal interpretation from the purview of the jury. *Finjan*, 626 F.3d at 1207. The same holds true here. The parties do not dispute that the term "checking the authenticity of the user" references the steps recited in column 6, lines 59-65. The steps recited therein, however, need not be redundantly imported into the definition of the term itself. Furthermore, defendants'

---

> checking whether an appended user mobile station number matches with a user mobile station number allocated to the user unique identifier stored in the private directory database.

[4] *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008). In *O2 Micro*, the Federal Circuit found that:

> The parties presented a dispute to the district court regarding the scope of the asserted claims—What do the patents mean when they say that the feedback signal controls power "only if said feedback signal is above a predetermined threshold"? O2 Micro contends that this "only if" limitation only applies during "steady state operation," while Defendants–Appellants contends that the "only if" limitation applies at all times without exception. This dispute over the scope of the asserted claims is a question of law. In deciding that "'only if' needs no construction" because the term has a "well-understood definition," the district court failed to resolve the parties' dispute because the parties disputed not the meaning of the words themselves, but the scope that should be encompassed by this claim language. 521 F.3d at 1361.

proposed construction "determining that the unique user is authorized to access the requested data or services" does not further clarify the term's meaning for the jury beyond its plain and ordinary meaning.   Moreover, unlike in *O2 Micro*, giving this term its plain and ordinary meaning does not permit the parties to present their claim construction arguments to the jury. *See O2 Micro*, 521 F.3d at 1362. The essential purpose of claim construction "is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement." *Id.* (quoting *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997)). Here, that purpose is accomplished by giving the term its plain and ordinary meaning.

## C.  The Ordering of Steps in Claim 1

Analysis next proceeds to the most consequential dispute at issue here; namely, whether the two steps enumerated in Claim 1 must be performed in the order in which they are written. Plaintiff argues that the steps may be performed in any order, while defendants contend that the steps must be performed in the order stated in the claim.

The Federal Circuit has developed a two-step analysis to determine whether the steps of a method claim must be performed in a particular order where, as here, the claim does not explicitly require that order:

> First, we look to the claim language to determine if, as a matter of logic or grammar, [the steps] must be performed in the order written.
>
> If not, we next look to the rest of the specification to determine whether *it* "directly or implicitly requires such a narrow construction."[5]

---

[5] *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369-70 (Fed. Cir. 2003) (quoting *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1343 (Fed. Cir. 2001) (internal citations omitted).

If neither logic or grammar nor the specification requires that the steps be performed in the order written, "the sequence in which [the] steps are written is not a requirement." *Altiris*, 318 F.3d at 1370.   Here, grammar, logic, and the specification all point persuasively to the conclusion that the steps of Claim 1 must be performed in the order stated in the claim.

### 1. Grammar

It is settled Federal Circuit law that when a past participle used in one step of a method claim references an action that occurred in a previous step, those steps must be performed in the order written. *See Tuna Processors, Inc. v. Hawaii Intern. Seafood, Inc.*, 327 Fed.Appx. 204, 209 (Fed. Cir. 2009) (holding that because "[i]n each step of the method, the smoke is referenced by using a past participle describing the action that occurred in the previous step," the patent required the steps to be performed in the order recited).   This reasoning applies squarely to the steps recited in the '297 patent.   As is shown below, step 1 involves checking whether the user unique identifier *is stored* in *a* private directory database.   Step 2 requires that the system perform a crosscheck between the user's mobile station number and the user unique identifier, which was *already found to be stored* in *the* private directory database referenced in step 1:

> **Step 1**: checking whether the user unique identifier *is stored* in *a* private directory database, and

> **Step 2**: checking whether the appended user mobile station number matches with the user mobile station number allocated to the user unique identifier *stored* in *the* private directory database;

It is clear that the use of the past participle "stored" to refer to the user unique identifier "stored in the private directory database" in step 2 describes the checking that occurred in step 1. Furthermore, while step 1 references *a* private directory database, step 2 uses the definite article to refer to *the* private directory database already established to exist in step 1.   The grammar of the claim therefore dictates that steps 1 and 2 must be performed in the order recited. *See Altiris*,

- 13 -

318 F.3d at 1369-70 (holding that grammar may determine that steps must be performed in the order stated in the claim).

## 2. Logic

Logic also dictates that the steps must be performed in the order written. If the two steps, as written, were reversed so that step 2 were performed before step 1, step 1 would effectively be read out of the patent because the system would necessarily end up performing step 1 in the course of performing step 2. If the order of the steps were reversed, they would be written as follows:

> **Step 2**: checking whether the appended user mobile station number matches with the user mobile station number allocated to the user unique identifier stored in the private directory database;
>
> **Step 1**: checking whether the user unique identifier is stored in a private directory database.

It is apparent from stating the steps in reverse that the result is illogical; checking whether the user unique identifier is stored in a private directory database logically must come first. In the process of checking whether the appended user mobile station number matches with the mobile station number allocated to the user unique identifier stored in the private database, the system must necessarily first check whether the user unique identifier is stored in the database. In other words, the system cannot cross reference the stored user unique identifier without first finding the user unique identifier in the database. Reversing the order of step 1 and step 2, therefore, would create an illogical construction.

Furthermore, Claim 1 provides that the system checks the authenticity of the user "based on the request message received by the server." Col. 6, l. 46. Pursuant to the claimed system, the user unique identifier is part of the request message. The mobile station number, on the other hand, is appended to the request message but is not part of the message itself. Defendants

- 14 -

correctly argue that for the system to check the authenticity of the user "based on the request message," the system must perform its initial authenticity check based on information that is contained in the request message itself (the user unique identifier), rather than information that is appended to the request message (the mobile station number). It therefore follows that step 1 must be performed before step 2 because were the order of the steps reversed, the system would not check the authenticity "based on the request message," as Claim 1 requires.

Plaintiff's argument that the steps may be performed in any order, distilled to its essence, is that it would be logically possible to design a system that performs the mobile station number check before the user unique identifier check. The function of the claimed system, plaintiff contends, is to perform a crosscheck between the user unique identifier and the mobile station number, and so the fact that that Claim 1 provides for checking of the user unique identifier before checking of the mobile station number is a "mere design choice." Pl.'s Mot. For Recons. Br. at 8. The fatal flaw in this argument is that although it may be entirely possible that a system that checks the mobile station number before the user unique identifier functions nearly identically to the system recited by the '297 patent, the '297 patent itself explicitly recites a system that first checks the user unique identifier and then verifies that against the mobile station number. And, "in accord with settled practice [courts] construe the claim as written." *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004). Accordingly, logic dictates that the steps of Claim 1 must be performed in the order written. *See Altiris*, 318 F.3d at 1369-70 (holding that logic may determine that steps must be performed in the order stated in the claim).

### 3. The Specification

As the Federal Circuit has made clear, in addition to the logic and grammar of a claim, the specification must be reviewed to ascertain whether it "directly or implicitly requires" that

- 15 -

the steps be performed in the order recited. *Interactive Gift*, 256 F.3d at 1343. Here, the specification lends additional support for the conclusion that step 1 must be performed before step 2. In this regard, the specification explains that "[i]f the user unique identifier is not present in the private directory database DB, then an error sequence is generated by the processing server . . . and access to private data or services is denied." Col. 4, ll. 19-22. Thus, the specification explicitly provides that if the system does not successfully complete step 1, it stops and fails to complete step 2. Moreover, the specification continues: "*After* this successful private directory look-up, a *second checking* is performed. . . . This *second check* consists in comparing the user mobile station number attached to the request message with the user mobile station number assigned to the user unique identifier and stored in the private directory database DB." Col. 4, ll. 37-42 (emphasis added). The specification thus directly requires that the steps in Claim 1 be performed in the order written, and indeed provides that if the system fails to complete step 1, it generates an error message and fails to proceed to step 2.

### 4. The Prosecution History

Defendants assert that, in addition to the language of the claim and specification, the doctrine of prosecution disclaimer bars plaintiff from arguing that the order of the steps in Claim 1 may be reversed. *See Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1095 (Fed. Cir. 2013) ("[W]hen the patentee unequivocally and unambiguously disavows a certain meaning to obtain a patent, the doctrine of prosecution history disclaimer narrows the meaning of the claim consistent with the scope of the claim surrendered.").

During the prosecution of the '297 patent, the inventors distinguished the claimed invention from a prior art reference known as Saunders, a system that authenticates a user based upon the temporary network address from which the request originates. Specifically, the

- 16 -

inventors distinguished the '297 patent by stating that "Saunders does not, teach or even suggest – as required by independent claim 1 of the present application – cross-checking whether a unique identifier received from a mobile station is being sent from the mobile station associated with the unique identifier." Defts.' Cl. Construction Recons. Br., Ex. 2, "Reply to Office Action of Dec. 14, 2005" at 3. Given this, defendants argue that because the inventors distinguished the '297 patent from Saunders based on the fact that the '297 patent crosschecks two piece of information, plaintiff is bound by the order of the steps as written. This argument is unpersuasive because although the inventors distinguished the '297 patent on the basis of the fact that it crosschecks two pieces of information, the inventors did not distinguish the patent based on the order in which those two pieces of information must be crosschecked.

Although defendants' prosecution disclaimer argument is unavailing, this does not alter the conclusion that the grammar and logic of Claim 1, coupled with the teaching of the specification, clearly establish that the steps of Claim 1 must be completed in the order written.

## IV.

In summary, for the reasons stated, the disputed portions of Claim 1 are determined to have the following constructions:

 i. **"user unique identifier"**

  Definition: "data that uniquely identifies a mobile station user"

 ii. **"checking the authenticity of the user"**

  Definition: The plain language is adequately clear and needs no further definition.

 iii. **The order for executing the steps of "checking whether the user unique identifier is stored in a private directory database" and "checking whether the appended user mobile station number matches with the user mobile station number allocated to the user unique identifier stored in the private directory database"**

Definition: "checking whether the user unique identifier is stored in a private directory database" must be executed before "checking whether the appended user mobile station number matches with the user mobile station number allocated to the user unique identifier stored in the private directory database."

An Order issued on August 16, 2013 setting forth these claim construction determinations. *N5 Techs. v. Capital One*, 1:13-cv-386 (E.D. Va., Aug. 16, 2013) (Order).

Entered this 24th day of October, 2013
Alexandria, VA

                                              /s/
                                        _____
                                        T. S. Ellis, III
                                        United States District Judge